UNITED STATES OF AMERICA,           )
                                    )
          Plaintiff,                )
                                    )
     v.                             )     Case No. 3:05-00037
                                    )     Judge Echols
CHARLES FRENCH RICHARDS             )
                                    )
          Defendant.                )

## MEMORANDUM

On February 23, 2005, a grand jury returned an Indictment charging Defendant Charles French Richards ("Richards") with knowingly possessing and attempting to possess a computer, floppy disks, and photographs that contained child pornography which had been transported in interstate and foreign commerce in violation of 18 U.S.C. § 2252A(a)(5)(B) & § 2252A(b)(2). Pending before the Court is Richards' "Motion to Dismiss Indictment" (Docket Entry No. 16) and his "Motion to Suppress the Fruits of the Warrantless Search and Subsequent Judicially Authorized Search of Richards' Storage Unit and for Franks Hearing" (Docket Entry No. 18), to which the Government has responded in opposition (Docket Entry Nos. 27 & 28). An evidentiary hearing was held on both motions on August 31, 2005,[1] after which the parties filed supplemental memoranda with respect to both the Motion to Dismiss (Docket Entry

---

[1] Defendant's request for a Franks hearing is moot because, as he conceded at the evidentiary hearing, any testimony which would be elicited at such a hearing was covered during the hearing on the Motion to Dismiss Indictment and Motion to Suppress. (Hrg. Tr. at 120).

Case 3:05-cr-00037   Document 50   Filed 11/21/05   Page 1 of 31 PageID #: 260

Nos. 41 & 43) and the Motion to Suppress (Docket Entry Nos. 42 & 44).

## I.  <u>FINDINGS OF FACT</u>

During the course of the August 31, 2005, evidentiary hearing, the Court heard from numerous witnesses.  Having reviewed the exhibits received, and the testimony of the witnesses, after considering their interests and demeanor, the Court finds the following to be the relevant facts.[2]

### A.  <u>Facts Relating to Seizure of Items</u>

This case arose as a result of a seizure of items which had been stored by Defendant in a storage unit at the Hilldale Storage and Records Management ("Hilldale Storage") facility located in Clarksville, Tennessee.  (Hrg. Tr. 15).  The events leading up to that seizure are as follows.

Beginning in June 1991, Defendant leased unit 234 at Hilldale Storage. (<u>Id</u>. at 16-17 & Ex. 2).   Unit 234, a 5' x 8' unit, is inside of a building containing 50-60 units running along both sides of a common hallway.  Entry into the building can be made either through the main gate, using a security code to unlock the exterior door to the building, or through a vault at the back of the rental office.  Upon entering the building, the lessee can access his or her unit by walking down the hallway which fronts the

_____

[2]Because these are the Court's findings, any contrary testimony on a specific matter has been rejected in favor of the specific fact found.

units. Each individual unit is secured by a lock owned by the lessee. (Id. at 16-17, 32, 41, 46, 66).

Over the years, Defendant signed two leases for unit 234. The leases gave Hilldale Storage the right to enter the unit in case of emergency which would include any sudden, unexpected circumstances or occurrences, such as a broken lock, that demanded immediate attention. (Id. at 59 & Ex. 2).

In February 2000, Jack Weir ("Weir") was a part-owner of Hilldale Storage. (Id. at 15). Vicki McArthur ("McArthur") was the manager of the facility and her brother, Gary Berg ("Berg"), worked part-time doing maintenance work and performing security checks.

In the recent past, the storage facility had experienced a series of burglaries from individual units after the burglars cut the locks from the doors of the units. Berg had been checking the units to make sure they were locked. (Id.). If a lock was found to be broken or missing, the standard practice was to inspect the unit to determine if the unit had in fact been burglarized or whether the renter simply had moved the goods from the unit. (Id. at 20-21, 24).

On February 21, 2000, while away at a convention in Boston, Weir received a call from McArthur who informed him that, during a routine check of the units, Berg discovered the lock on unit 234 had been cut. (Id. at 21). Upon entering the unit to investigate, Berg observed what he believed to be child pornography.[3]

---

[3]It is unclear whether McArthur also entered the unit to investigate. She did not testify at the evidentiary hearing. On the one hand, the evidence suggests that she entered the unit since

Although Berg did not testify at the evidentiary hearing, this Court finds from the evidence that Berg entered the unit and inspected what was stored therein. This factual finding is supported by Berg's statement to Detective Crabbe ("Crabbe") that during a routine inspection of the storage units he discovered the lock had been cut off of unit 234, that he checked that unit to determine if any of the property stored in the unit was damaged or broken, and that to do so he entered the unit. (Docket Entry No. 18, Ex. D). During Berg's inspection he apparently opened one of the suitcases in the unit and discovered it was filled with pornographic material. When Weir returned Berg showed the contents of the suitcase to him. The finding is also supported by the initial call to the police by the manager who stated they had found a storage unit "full of pornography." In order to make that determination one would have to enter the unit and look around. (Id. Ex. C ¶ 6). Furthermore, it would only be reasonable to do so. Additionally, an Affidavit from Defendant's own private investigator states that Berg told the investigator he "explored" the unit after discovering the lock had been cut. (Id. Ex. A, ¶ 4).

Upon hearing of the potential burglary, Weir told McArthur to place one of the facility's master locks on the unit and that he would investigate the matter when he returned to town. (Id. at

she told Weir about the "disturbing" pornography found in the unit and would later report to the police they had discovered a storage unit "full of pornography." However, that same information may have come from what her brother Berg told her when he inspected the unit, and hence, the Court makes no specific finding on whether she entered the storage unit.

4

22).  According to Weir, he did so because he felt people sometimes "blow things out of proportion" and he wanted to see for himself what actually was located in the unit before he notified the authorities.  (<u>Id</u>. at 22-23).

In approximately one week, Weir returned to Clarksville and he and Berg went to inspect the unit together.  (<u>Id</u>. at 25).  After Berg removed the master lock and the door was opened, Weir observed that the floor to unit 234 was covered with miscellaneous items two to two and one-half feet high and one could not enter the unit without stepping on items stacked on the floor.  (<u>Id</u>. at 32).  Even though some items were in containers, or on videotapes, much of the material contained nude photographs of young women and boys that were just lying scattered around and on top of the stacks.  (<u>Id</u>. at 34-36).

Berg lifted the top of a suitcase or briefcase in the unit to show Weir the contents.  (<u>Id</u>. at 26).  Within the suitcase or briefcase Weir observed photographs of nude minors, a book about how to pick up young girls,[4] and a picture of a five or six year old boy with an erection.  (<u>Id</u>. at 26-27).  The suitcase or briefcase was at the front of the unit and once its top was lifted, the book and photographs could be observed without entry into the unit.  (<u>Id</u>. at 33).

---

[4]Weir testified that the book's cover contained a picture of a young girl who appeared to be undressing in front of an older man who was sitting on a couch.

5

Although Weir testified that he did not enter the unit and that it was not possible to enter the unit because items were scattered around the floor, (id. at 33), the Court finds it is unlikely that Weir would not enter the unit in attempting to confirm a report from McArthur that Berg had discovered child pornography in unit 234. Weir had instructed McArthur to lock the unit until he returned from Boston to investigate the situation. (Id. at 22). The evidence and commonsense suggests that Weir, as owner of the facility, did not just stand at the threshold of the unit and peer inside. Instead, it is much more probable from the evidence that he, like Berg, went inside the unit to see what was stored inside and Berg showed him what he had found. Later, Weir escorted the police to the unit and showed them some of the pornographic material.

After viewing the pornographic items in the unit, Weir instructed Berg to lock the door. He then placed a call to Hilldale Storage's attorney for advice which he did not receive until March 2, 2000. (Id. at 27). After reviewing a faxed copy of the lease for the unit, Weir's attorney told Weir to contact law enforcement authorities. (Id). That same day, McArthur called the police. (Id. at 29). A copy of the initial radio transmission from the Clarksville Police Department dispatcher to patrol officer Outlaw ("Outlaw") reveals that a complainant at Hilldale Storage at 2210 Gulf Club Lane called and reported that "they have located a storage unit that is full of pornography material." (Docket Entry No. 18, Poland Aff. ¶ 6). Outlaw, the first officer to respond,

6

arrived at Hilldale Storage sometime shortly after 5:00 p.m. (Hrg. Tr. at 49-50).[5] He met with Weir, Berg, and McArthur who told him about the pornography they had seen in the unit. Weir then escorted Outlaw to the unit and unlocked the door without being asked or told to do so by Outlaw. (Id. at 29-31).

After looking inside the unit, Weir lifted the top of the suitcase or briefcase at the front of the unit to show Outlaw the photographs and book cover they had discovered. Outlaw saw the photographs and book cover and then instructed Weir to close the unit. (Id. at 30 & 57).

Shortly after Weir and Outlaw exited the storage building, other officers began arriving on the scene. (Id. at 31). Patrol officer Seay ("Seay"), the second officer on the scene at Hilldale Storage, arrived about ten minutes after Outlaw. After going to the office, Seay was escorted by either Weir or Berg to unit 234.[6] Weir testified that the door on unit 234 was closed when he and Outlaw left, but Seay testified that the door to the unit was at least a foot ajar (Id. at 66). This Court credits Seay's testimony and finds the door was left at least partially open after Weir and Outlaw looked into the unit.

––––––––––––––––––––

[5]After Outlaw arrived, he realized the storage facility was not located in his patrol district, but in the adjoining patrol district 3. He reported this information to the dispatcher who immediately called for patrol officer Seay to respond. (Docket Entry No. 18, Poland Aff. ¶ 6).

[6]Seay does not recall if Outlaw accompanied them. (Id. at 65). Weir testified that he did not go back to the unit after showing Outlaw its contents until the search warrant arrived.

7

Seay looked inside and saw that the unit was cluttered with papers, videotapes, and other items lying about. (Id. at 66-67). He did not enter, or even reach into the unit, but Seay observed a picture of a young girl who was completely naked. (Id. at 65-67). Weir was told that the police were going to get a search warrant to search the unit. (Id. at 31-32). Weir, Berg, and McArthur remained in the office and waited for the search warrant to arrive. Seay then contacted his supervisor, Sergeant Mishoe ("Mishoe"), told him what he observed in the storage unit, and suggested he might want to come to the scene. (Id. at 67 & 79). When Mishoe arrived, both Seay and Mishoe went back to the unit and looked inside.[7] According to Seay, neither he nor Mishoe entered the unit. (Id. at 79).[8] Mishoe then called his supervisor, Lieutenant Gray, and asked him to come to the storage facility.

Detective Crabbe was called to the scene by Lieutenant Gray. Crabbe was the detective on duty in charge of investigating crime

---

[7]According to the dispatcher's transmission log, Outlaw also called his supervisor, Sergeant Poston, and asked him to come to the storage facility. Shortly thereafter, Outlaw received a call that there was trouble at a nearby McDonald's restaurant and he left the scene. Seay testified that Sergeant Poston came to the scene, but there was no testimony that Poston entered the unit. (Id. at 76 & Docket Entry No. 18, Poland Aff. ¶ 6).

[8]Hugh Poland ("Poland"), one of the attorneys retained to represent Defendant, asserts in an Affidavit that Outlaw told him in the presence of two others that "Mishoe entered the locker and viewed the material." (Docket Entry No. 31, Ex. 1). None of these individuals, however, were called to testify at the suppression hearing and this Court credits Seay's live testimony as believable since it was planned that the police would apply for a search warrant to search the unit.

8

scenes within District 3.  (Id. at 83).  Upon arrival Crabbe was
briefed by both Sergeant Mishoe and Seay, and he took written
statements from Weir, Berg, and McArthur.  (Id. at 84, 86 & 88).
He went back to the unit to make sure it was secured and that no
one was going in or out of the unit.  (Id. at 87).

During the evidentiary hearing, Crabbe testified that after
being briefed by Sergeant Mishoe and Seay and taking statements
from Weir, McArthur, and Berg, he went to see unit 234.  When he
arrived, the door to the unit was open and Crabbe could see several
stacks of boxes, photographs, videotapes and envelopes.  (Id. at
90).[9]  The unit itself was not lit, but there was lighting in the
hallway which illuminated most of the unit.  (Id. at 110). From the
threshold of unit 234, Crabbe saw a picture of a naked minor child
lying on top of a cardboard box and/or a suitcase.  (Id. at 91 &
94).  Crabbe stepped approximately two feet into the unit to get a
closer look and to confirm what Berg had told him about finding
child pornography.  (Id. at 95-96 & 98).  The Court credits this
testimony and finds that Crabbe stepped approximately two feet into
the unit for the purpose of confirming what he had been told by
Berg and, upon doing so, did nothing more than lift up the picture
of the naked child which was lying in plain view.

Because of the nature of the offense and the volume of the
material in the unit, Crabbe viewed the situation as being a major
case which would require assistance from other units with a camera

---

[9]Like Weir, Crabbe described the unit as being relatively full
of items.  (Id. at 91).

crew, identification equipment, inventory crew, and transportation vehicles, such as special operations or the major crimes unit. Accordingly, he called his supervisor, Lieutenant Carney ("Carney"), for further assistance. (Id. at 101).[10]

After confirming the existence of what Crabbe considered to be child pornography, and consulting with Lt. Carney when he arrived at the scene, Crabbe drafted an application for a search warrant. In preparing the application, he utilized a template which had been used in obtaining search warrants in previous child pornography cases. (Id. at 103-104, 116). The "Statement of Facts in Support of Probable Cause" by Crabbe was as follows:

> That Affiant did receive a statement on March 2, 2000 from GARY W. BERG, an employee of Hilldale Self Storage Inc., that during a routine inspection of the storage units at Hilldale Self Storage on February 21, 2000, he found the lock cut or broken off unit # 234. Mr. Berg did check unit # 234 to determine if any of the stored property was damaged or stolen. Upon entering the

_____

[10]The record reflects that numerous officers responded to the call involving unit 234. However, contrary to Defendant's suggestion that Clarksville officers were running around pell mell without supervision and ran amok after hearing that a storage unit full of pornography had been discovered, the radio transmissions legitimately explain each officer's involvement. As indicated, Outlaw was the first to respond and he radioed his supervisor Sergeant Poston. Because the facility was not located in Outlaw's precinct, Seay was called to the scene by the dispatcher and Outlaw was released to handle a call involving a disturbance at McDonald's. After Seay arrived, he called his supervisor, Sergeant Mishoe. Mishoe in turn called his supervisor, Lieutenant Gray, and asked him to come to the storage facility to see the material in the unit and approve what needed to be done. Lieutenant Gray called Crabbe to the scene because he was the on-duty investigator for District 3. (Docket Entry No. 18, Ex. C ¶ 6). Finally, Crabbe called his supervisor, Lieutenant Carney, because he thought he needed special help to investigate and process the material that had been found in the unit.

10

> unit Mr. Berg did observe several photographs of what
> appeared to be young females approximately 10 to 14 years
> of age having oral sex and intercourse with an older
> male. Mr. Berg did notify his Manager Vicki McArthur who
> contacted the owner Mr. Jack Weir who advised them to
> secure the unit until he returned from out of town. Upon
> his return Mr. Weir contacted his attorney who advised
> him on March 2, 2000 to contact the Police.

(Docket Entry No. 18, Ex. D). Crabbe did not indicate that he had

stepped into the unit to confirm what Berg had told him. (Hrg. Tr.

at 101-102). A search warrant was issued by a state court judge at

9:33 p.m. that evening. (Docket Entry No. 18, Ex. D).

A subsequent search of the storage unit revealed a great deal

of both child and adult pornography. (<u>Id</u>. at 114-115).

Additionally, numerous computer disks, nude prints and envelopes

from foreign countries containing pictures of nude children were

found. (<u>Id</u>. at 110-111 & 178-181 & Exs. 10, 11 & 12).

Based upon the information obtained as a result of the search

of unit 234, Crabbe applied for another warrant to search

Defendant's apartment. (Docket Entry No. 18 Ex. E). As probable

cause for the warrant, Crabbe indicated that execution of the

warrant of unit 234 revealed pictures and floppy disks containing

child pornography. A state search warrant was issued and a search

of Defendant's apartment was conducted on March 3, 2000. Pictures

and floppy disks found during the search of the apartment contained

many images of child pornography. (<u>Id</u>. Exs. E & F).

## B. <u>Facts Relating to Interstate Commerce</u>

After federal law enforcement authorities assumed jurisdiction

of the case, F.B.I. Agent Bret Murray applied for a search warrant

11

to examine Defendant's computer and floppy disks which had been seized from Defendant's apartment. Probable cause was alleged to exist because of the pornography found in unit 234, because videos and photographs of child pornography were found during the search of Defendant's apartment, and because floppy diskettes taken from the apartment were found to contain images of child pornography. A federal Magistrate Judge issued a search warrant for Defendant's Hewlett Packard ("HP") computer, and 165 floppy diskettes seized during the searches of unit 234 and Defendant's apartment. (Docket Entry No. 18, Ex. F).[11]

A computer forensic examiner for the Federal Bureau of Investigation, John Kerley ("Kerley"), testified that at the time of the seizure, virtually all computers were assembled overseas, even though many of the parts were manufactured in the United States. (Hrg. Tr. at 133). He also testified that he was unaware of any computer assembly facilities which were located in Tennessee at the time of the events in question. (Id.).[12]

Kerley explained that Defendant's HP computer was equipped with a modem for use in connecting with the Internet and had an Internet browser icon on the desktop connected to the Internet. (Id. at 138, 141-142). Additionally, the desktop had an icon for

---

[11]Eighty-seven of the floppy diskettes were seized from Defendant's apartment and the remaining 78 were seized from his storage unit.

[12]F.B.I. Agent Murray testified that the HP computer had a sticker on its tower indicating that it was assembled in the United States from domestic and foreign parts. (Id. at 173-174).

12

washer.exe which runs in conjunction with Microsoft and is used to either overwrite or delete cookies and temporary internet files and to erase evidence of Internet usage.  (_Id_. at 143-144).

Kerley testified that Defendant's HP computer contained multiple images of what appeared to be children in sexual situations, as did the floppies and zip disc.  (_Id_. at 133-134). Some of the images on the hard drive had "WWW" (meaning the world wide web) imprinted on them,[13] suggesting that at some point the pictures were associated with the Internet.  (_Id_. at 137).

Additionally, Kerley found pictures from the "Paraguay series" on the hard drive which consists of a series of photographs taken in Paraguay of very young nude girls engaged in various types of sex acts, (_id_. at 76), and pictures of Asian children engaged in sexual acts. (_Id_. at 137 & 156).  Kerley also found www addresses for such sites as Dragon Fire and Banner Swap, the former of which is a pornographic site and the latter of which links to various sites, including pornographic sites. (_Id_. at 148-149).  Also found were computer files indicating the user had accessed a bulletin board on the Internet which contained web addresses for various sites including Lolita, a known child pornography site.  (_Id_. at 157-159).  Based upon his review, Kerley's opinion was that Defendant's computer had been connected to Internet pornographic websites at various times.  (_Id_. at 161).

---

[13]At least two of the pictures with "WWW" imbedded upon them were of nude girls.  (_Id_. at 154-156 & Exs. 7 & 8).

13

## II.  <u>**LEGAL ANALYSIS**</u>

Defendant has moved to dismiss the Indictment on the grounds that the Government can establish no connection with interstate commerce so as to warrant federal jurisdiction.  Defendant also seeks to suppress the evidence retrieved from the storage unit on the grounds that the initial warrantless search by the Clarksville Police Department was unlawful and the subsequent issuance of the search warrant for unit 234 did not cure that unlawfulness. Defendant further asserts that if the search of unit 234 is found to be unlawful, the search of his home, computer, and disks was also unlawful because the search of those items evolved from the search of his storage unit.

## A.  <u>**Motion to Dismiss Indictment**</u>

Defendant has been charged with possessing and attempting to possess a computer, floppy disks, and photographs that contained images of child pornography that had been transported in interstate commerce in violation of 18 U.S.C. 2252A(a)(5)(B).[14]  That section prohibits the knowing possession of "any book, magazine, periodical, film, videotape, computer disk, or any other material that contains an image of child pornography" if it was produced with materials that have been "mailed, or shipped or transported in interstate or foreign commerce by any means, including by computer."  It is Defendant's contention that the Government cannot

---

[14]Defendant is also charged under 18 U.S.C. § 2252A(b)(2) which sets forth the penalties for a violation of 18 U.S.C. § 2252A(a)(5)(B).

14

prove a sufficient connection with interstate or foreign commerce so as to meet the jurisdictional requirement of the statute.

Congress has the power under the Commerce Clause to regulate "activities that substantially affect interstate commerce," as well as the channels and instrumentalities of interstate commerce. United States v. Lopez, 514 U.S. 549, 558-59 (1995). Whether an activity is one that substantially affects interstate commerce is determined by focusing on four factors: (1) whether the regulated activity is economic in nature; (2) whether the statute contains an express jurisdictional element which limits its application to activities with "an explicit connection with or effect on interstate commerce"; (3) whether there are congressional findings about the regulated activity's effects on interstate commerce; and (4) whether the connection between the activity and a substantial effect on interstate commerce is attenuated. United States v. Morrison, 529 U.S. 598, 610-613 (2000).

In this case, Defendant argues that the application of 18 U.S.C. § 2252A(a)(5)(B) to his conduct is an "unconstitutional, over-extension of the Commerce Clause." (Docket Entry No. 17 at 9). In this regard, Defendant argues that his "intrastate possession of pornography was exclusively for personal use (i.e. simple possession)," and thus this case more properly belongs in state court. (Id. at 6 & 9).

As support for his position, Defendant relies upon United States v. Maxwell, 386 F.3d 1042 (11th Cir. 2004) which he claims presented a "remarkably analogous situation[.]" (Docket Entry No.

17 at 6).  While it is true that the defendant in Maxwell was prosecuted for possessing child pornography after a search of his computer and floppy disks revealed sexually explicit images of children, it is there that the similarity ends.  According to the Eleventh Circuit, the government in that case "relie[d] entirely on the fact that the disks on which the pornography was copied traveled in interstate commerce[.]"  Id. at 1055.  In that court's view, the connection between the defendant's conduct and interstate commerce was "attenuated" given that he "ha[d] done nothing more than possess two disks that traveled from out-of-state."  Id. at 1058.  While there was evidence Maxwell utilized a computer which had access to the Internet, "the Government did not establish that the child pornography traveled across state lines.  Consequently, its case relied on establishing that the images were *produced* by material that did."  Id. at 1045 (italics in original).

Here, the relationship to interstate commerce is not so attenuated.  Not only has the Government submitted evidence indicating that the computer which contained child pornography images was assembled overseas, it has also introduced evidence that at least some of the images came from the Internet, suggesting an origin outside of Tennessee.  Further, envelopes containing child pornography from out of state and foreign countries were found in the search of unit 234.

The United States Court of Appeals for the Sixth Circuit in United States v. Corp, 236 F.3d 325 (6th Cir. 2001) addressed the Commerce Clause in connection with federal child pornography cases

16

involving the possession of visual depictions of minors under section 2252(a)(b)(4). After first determining that the statute was not unconstitutional on its face, the Sixth Circuit determined that the statute, as applied to the "unusual and undisputed facts of this case," id. at 325, had an insufficient nexus with interstate commerce.

In Corp, a twenty-three year old male took in film for developing at a local pharmacy. Id. at 326. The film contained pornographic images of Corp's twenty-six year old wife and Corp's seventeen-year old girlfriend engaged in sexual activity. Id. There was no evidence that Corp distributed the photographs, gave copies to others, or invited others to look at the pictures. Id. Nevertheless, Corp was tried and convicted on federal charges of possessing child pornography.

In reversing Corp's conviction, the Sixth Circuit noted that the defendant "was not involved nor intended to be involved in the distribution or sharing with others of the pictures in question" nor was the girlfriend (who was just months away from reaching her majority) "a victim in any practical sense of the word." Id. at 332. The court concluded by observing that "[c]learly, Corp was not the typical offender feared by Congress that would become addicted to pornography and perpetuate the industry via interstate connections." Id. at 333.

In reaching its conclusion, the Sixth Circuit set forth certain questions which a court may consider in order to insure the jurisdictional reach of the statute is properly limited:

Case 3:05-cr-00037   Document 50   Filed 11/21/05   Page 17 of 31 PageID #: 276

> Was the activity in this case related to explicit and graphic pictures of children engaged in sexual activity, particularly children about fourteen years of age or under, for commercial or exploitive purposes? Were there multiple children so pictured? Were the children otherwise sexually abused? Was there a record that defendant repeatedly engaged in such conduct or other sexually abusive conduct with children? Did defendant move from place to place, or state to state, and repeatedly engage in production of such pictures of children? These questions are relevant to a determination on a case-by-case basis about whether the activity involved in a certain case had a substantial effect on commerce.

Id. Not all of the questions need be answered in the affirmative in order to find a sufficient nexus to interstate commerce. See, United States v. Andrews, 383 F.3d 374, 378 (6th Cir. 2004)(finding a basis for federal jurisdiction even though "not all the Corp questions [we]re pertinent").

This Court finds that the Government has presented more than sufficient evidence to meet at least the first two questions posed by Corp. That evidence includes (1) a modem on Defendant's computer for accessing the Internet; (2) an Internet browser on Defendant's computer, the only purpose of which is to access the Internet; (3) a washer.exe program on Defendant's computer to delete or overwrite evidence of Internet usage; (4) files on his computer indicating access to bulletin boards which contained information about Internet addresses for pornographic sites; (5) images of child pornography found on the computer with Internet addresses embedded on them; (6) pictures identified as being a part of the "Paraguay series" found on the computer; and (7) three envelopes found in unit 234 bearing postmarks from foreign

18

countries and containing pictures of child pornography. <u>See</u>, <u>United States v. Dodd</u>, 347 F.3d 893, 900 (11th Cir. 2003)("circumstantial evidence may be used to prove that pornography was obtained through the internet" and that evidence was sufficient to convict where there was no evidence defendant "performed the difficult task of hand collecting the images"); <u>United States v. Runyan</u>, 290 F.3d 223, 242 (5th Cir. 2002)("Government must provide some evidence linking the specific images supporting the conviction to the Internet in order to establish an interstate commerce connection under 2252A" and "presence of website address embedded on the image" is circumstantial evidence linking the image to the Internet").

Moreover, unlike in <u>Corp</u>, such evidence could lead a jury to conclude that Defendant was involved or intended to be involved in the sharing of child pornography and that he was the type of offender which Congress feared could become addicted to child pornography thereby promoting the existence of that industry. Accordingly, Defendant's Motion to Dismiss Indictment will be denied.

**B. <u>Motion to Suppress</u>**

Defendant's Motion to Suppress rests on two major grounds. Defendant claims that the police unlawfully searched unit 234 prior to the issuance of a search warrant in violation of his Fourth Amendment rights. Defendant also claims that the search warrant issued by the state court judge was not supported by probable cause. As a result, Defendant argues that the evidence seized from

19

unit 234 must be suppressed, along with the evidence subsequently seized from his apartment (including the evidence seized as a result of the search of his computer), because the probable cause utilized to support those searches derived from the initial search of his storage unit.

      **1.** ***Search of Unit 234***

Defendant asserts, and the Government does not dispute, that as the lessee of unit 234, he had a reasonable expectation of privacy in the contents of that locked storage unit. <u>See</u>, <u>United States v. Salgado</u>, 250 F.3d 438, 456 (6th Cir. 2001)("[b]y placing personal effects inside the storage unit, Lyons manifested an expectation that the *contents* would be free from public view")(italics in original). Additionally, insofar as images of child pornography were stored in closed containers, Defendant also had an expectation of privacy in the content of those containers. <u>See</u> <u>United States v. Waller</u>, ___ F.3d ___, ___, 2005 WL 2708784 (6th Cir. Oct. 25, 2005)(Defendant evidenced reasonable expectation of privacy in luggage bag which was zipped closed and stored in bedroom closet). Thus, absent an exception to the warrant requirement, police could not search unit 234 or the containers within it without Defendant's consent.

The initial search in this case did not violate the Fourth Amendment because it was conducted by Berg and then Weir, both of whom were private individuals acting under the authority granted to them under the lease of the storage unit, and neither of whom was acting at the behest of law enforcement officials. The Fourth

20

Amendment is "wholly inapplicable 'to a search or seizure, even an unreasonable one, effected by a private individual not acting as an agent of the Government or with the participation or knowledge of any governmental official.'" <u>United States v. Jacobsen</u>, 466 U.S. 109, 114-15 (1984)(quoting <u>Walter v. United States</u>, 447 U.S. 649, 662, (1980) (Blackmun, J., dissenting)).  Defendant concedes as much.  (Docket Entry No. 42 at 7, n.4).[15]

While the initial search by the employees and owner of the storage facility was proper, that does not mean that the actions of the police officers who were called to the scene prior to the issuance of the search warrant for unit 234 are not subject to scrutiny.  This is because "the Government may not exceed the scope of the private search unless it has an independent right to search."  <u>United States v. Williams</u>, 354 F.3d 497, 509 (6th Cir. 2003).

In this case, the Court finds that Crabbe did not exceed the scope of the private search by Berg and Weir.  While Weir testified that he did not enter the unit, the evidence and commonsense suggests otherwise.   Unquestionably Berg entered the unit and looked around because he told Crabbe he had entered  the unit while investigating a possible break-in and because he told Defendant's own investigator he "explored the unit" and then notified McArthur and Weir about what he had found.  (Docket Entry No. 18 Ex. A ¶

---

[15]While Defendant argues that the Sixth Circuit has declined to extend <u>Jacobsen</u> to searches of private residences, (<u>id</u>. at 9) he cites no case (and the Court has found none) which suggests that the private search doctrine would not apply to storage units.

21

4). It appears the complaint to the police department that they had found a storage unit "full of pornography" was based on Berg's search. Moreover, apart from Berg's entry into the unit and investigation of the contents to determine if there had been a burglary, both Weir and Berg, at different times, opened the top to a briefcase or suitcase in the unit which contained child pornography.

All Crabbe did was step into the unit and pick up a picture of a nude individual that was lying in plain view to determine more closely whether it was child, as opposed to adult, pornography. This sole act by that one officer was not more expansive than the private searches which had previously been conducted.

Defendant's position that the Clarksville police rummaged through the unit prior to the arrival of the search warrant is not supported by the evidence. The only evidence which even remotely supports Defendant's position is an Affidavit from his own private investigator, Davis, who relays what others supposedly told him, and an Affidavit from McArthur. Davis claims that McArthur told him Weir and Outlaw entered the unit prior to the search, (Docket Entry 18 Ex. A ¶ 6), and that Outlaw and other unnamed Clarksville officers "touched and viewed some of the materials that had been inside the storage unit prior to the search warrant arriving." (Id., Ex. B ¶ 7).

This Court credits both Weir's and Crabbe's personal testimony at the hearing over the statements contained in the Affidavits of Davis and McArthur. For whatever reason, neither Davis nor

McArthur testified and subjected themselves to the rigors of cross examination. Moreover, both Affidavits are suspect because of their conspicuous omissions of material facts relating to the events in question. In fact, the Affidavits appear intentionally to have been drafted solely to highlight alleged facts which are favorable to the Defendant. For example, conspicuously absent from Davis' recounting of what Berg told him is any mention of (1) what Berg discovered after he "explored the unit"; (2) how Berg went about his search of the unit; (3) what he reported to McArthur that he had found; (4) what McArthur did after she received Berg's report; (5) what Weir did to confirm Berg and McArthur's report of child pornography upon his return; and (6) who called the police, what was said, and what request was made. Similarly, McArthur, who never explains what she did in terms of looking at the pornography which she described to Weir as "disturbing," states in her Affidavit that Berg, Weir and she were present when Outlaw arrived, yet makes no mention of (1) precisely what Weir did when he "showed Officer Outlaw the storage unit that contained pornography"; (2) what Outlaw did upon being shown the material; (3) what, if anything, Berg was doing during this period; and (4) the names of the officers who "touched and viewed some of the materials," or even what they looked like. To the contrary, Weir testified that he, along with McArthur and Berg, returned to the office after he showed Outlaw the unit and waited for the arrival of the search warrant. Given the overall credibility of the owner, Weir, and police officers Seay and Crabbe, together with all the

23

other evidence, this Court is not prepared to take the leap urged by Defendant and find the witnesses who testified were untruthful in stating that no police officer, except Detective Crabbe, entered the unit prior to the arrival of the search warrant. Crabbe's minor intrusion was to confirm that the picture he saw in plain view was that of a minor girl.

Further, whether police officers exceed the scope of an initial private search is a question of degree. See, Jacobsen, 466 U.S. at 115 (the "additional invasions of . . . privacy . . . must be tested by the degree to which they exceeded the scope of the private search."). "Language from the Supreme Court's Jacobsen opinion suggests that the critical inquiry under the Fourth Amendment is whether the authorities obtained information with respect to which the defendant's expectation of privacy has not already been frustrated." United States v. Runyan, 275 F.3d 449, 461 (5th Cir. 2001). "Thus, Jacobsen directs courts to inquire whether the government learned something from the police search that it could not have learned from the private searcher's testimony and, if so, whether the defendant had a legitimate expectation of privacy in that information." Id.

Given Jacobsen, even if Crabbe's stepping into the unit and looking at a picture exceeded the scope of Berg's search, the evidence still would not be suppressed. The police did not learn something which they had not been told after the investigations and through the statements of Weir, Berg, or McArthur. See, United States v. Simpson, 904 F.2d 607, 610 (11th Cir. 1990)("Their search

24

of the box and videotapes did not exceed the scope of the prior private searches for Fourth Amendment purposes simply because they took more time and were more thorough than the Federal Express agents").[16]

**2. *Validity of the Search Warrant***

Defendant contends the Affidavit submitted to the state court judge by Crabbe was insufficient to establish probable cause. "The standard of review for the sufficiency of an affidavit 'is whether the magistrate had a substantial basis for finding that the affidavit established probable cause to believe that the evidence would be found at the place cited.'" United States v. Greene, 250 F.3d 471, 478 (6th Cir. 2001)(quoting United States v. Davidson, 936 F.2d 856, 859 (6th Cir. 1991)).

In support of his contention that there was insufficient probable cause presented to the state court judge to justify the issuance of a search warrant, Defendant places primary reliance upon United States v. Weaver, 99 F.3d 1372, 1377 (6th Cir. 1996)

---

[16]Because of this conclusion, the Court does not need to address the Government's alternative argument that the independent source doctrine could save an otherwise invalid search. "The independent source rule holds that evidence will be admitted if the government shows that it was discovered through sources 'wholly independent of any constitutional violation.'" United States v. Jenkins, 396 F.3d 751, 757 (6th Cir. 2005)(citation omitted). The rule is not applicable, however, where officers are prompted to obtain a warrant by what they observe during an initial warrantless entry. Id at 758. Although Crabbe bases his search warrant Affidavit solely on what he was told by Berg, he testified he stepped into the unit to confirm what he had been told by Berg. (Hrg. Tr. at 106). Under these facts, the independent source doctrine does not appear to apply.

25

which "recognize[d] that two factors are critical to determining whether an affidavit based on a confidential informant's tip provides a 'substantial basis' for finding probable cause: (1) an 'explicit and detailed description of alleged wrongdoing, along with a statement that the event was observed firsthand, entitles [the informant's tip] to greater weight than might otherwise be the case'; and, (2) corroboration of the tip through the officer's independent investigative work is significant." Based upon <u>Weaver</u>, Defendant argues that the Affidavit in support of the request for a search warrant is fatally defective because it does not recite any basis for determining Berg's reliability, nor does it indicate that there was any independent law enforcement corroboration of Berg's observations. (Docket Entry No. 19 at 9).

Defendant's reliance on <u>Weaver</u> is misplaced because its holding has been curtailed. In <u>United States v. Allen</u>, 211 F.3d 970, 975 (6th Cir. 2000), the Sixth Circuit, *en banc*, held that "<u>Weaver's</u> holding that the uncorroborated search warrant was defective is limited to the facts of that case" and that "<u>Weaver</u> does not support the general propositions that a CI's information must always be independently corroborated by police, or that an affidavit must in every case set out and justify a CI's expertise in identifying the particularities of the criminal activity alleged[.]" Instead, "[t]he affidavit is judged on the adequacy of what it does contain, not on what it lacks or on what a critic might say should have been added." <u>Id</u>.

26

Unlike Weaver, this is not a case where the police used a confidential informant to support their affidavit for issuance of a warrant. Berg is specifically identified. Where a citizen provides information to a police officer and that individual is named, the "tip is considered to be more supportive of a finding of probable cause[.]" United States v. May, 399 F.3d 817, 823 (6th Cir. 2003). "This is so largely because the informant's recitation to the police, "if fabricated[,] would subject him to criminal liability." Id. (quoting, Illinois v. Gates, 462 U.S. 213, 233 (1983)).

Further, the information provided to the state court judge was sufficient to find probable cause to issue a search warrant. The Supreme Court has indicated that

> [t]he task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place. And the duty of a reviewing court is simply to ensure that the magistrate had a substantial basis for concluding that probable cause existed.

Gates, 462 U.S. at 238-39.

Crabbe's Affidavit in support of probable cause states that Berg, an employee of the storage facility discovered that a lock on unit 234 had been cut off and he entered the unit to determine if any of the stored property had been damaged or stolen. During the course of Berg's investigation he observed several photographs of young females approximately 10 to 14 years of age having oral sex and intercourse with an older male.

27

"A court must look to the 'totality of the circumstances' . . . in order to answer 'the commonsense, practical question' of whether an affidavit is sufficient to support a finding of probable cause.'" <u>May</u>, 399 F.3d at 822 (quoting, <u>Gates</u>, 462 U.S. at 230). "Probable cause exists 'when there is a fair probability given the totality of the circumstances that contraband or evidence of a crime will be found in a particular case.'" <u>United States v. Greene</u>, 250 F.3d 471, 479 (6th Cir. 2001)(citation omitted). A judge's "determination of probable cause is afforded great deference by a reviewing court" and the "decision to grant a search warrant should only be reversed if it was arbitrarily exercised." <u>Id</u> at 478.

Reviewing the present Affidavit in a commonsense manner and giving deference to the state court judge, this Court finds that the Affidavit presented sufficient facts from which it could be concluded that evidence of child pornography would be found in unit 234. A named individual employee of the storage facility was reported to have given the police a statement about discovering illegal material in a unit with the lock cut off, i.e., pictures of young females, aged approximately 10 to 14 years of age, engaged in sexual acts with an older male. The Affidavit also established the recent nature of the discovery, that the employee had contacted the manager of the facility, that the manager had contacted the owner who ordered the unit secured until he got back in town, that upon his return the owner contacted his attorney, and that the attorney advised the owner to call the police. This explained the reason

28

for the delay in seeking the warrant, and disclosed the fact that the unit had been sealed since the discovery until the day of the application for the search warrant.  These facts presented the state judge with ample facts to believe that child pornography would be found in unit 234.

Even if the foregoing were insufficient to establish probable cause, this does not mean the evidence of the material found in unit 234 necessarily would be suppressed.  "Though evidence obtained in violation of the Fourth Amendment is generally excluded, the Supreme Court has held that the exclusionary rule 'should be modified so as not to bar the admission of evidence seized in reasonable, good-faith reliance on a search warrant that is subsequently held to be defective.'" United States v. Frazier, 423 F.3d 526, 534 (6th Cir. 2005) (quoting, United States v. Leon, 468 U.S. 897, 905 (1984)). "The 'good faith inquiry is confined to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization.'" Id. (quoting Leon, 468 U.S. at 922-23 n.23).

"Pursuant to Leon," this Court "must now decide whether the officers in the instant case had a reasonable basis to believe that the information that *was submitted* supported the issuance of a search warrant." United States v. Carpenter, 360 F.3d 591, 595 (6th Cir. 2004)(italics in original); see also, United States v. Laughton, 409 F.3d 744, 751-52 (6th Cir. 2005)("whether an objectively reasonable officer would have recognized that an

29

affidavit was so lacking in probable cause as to preclude good faith reliance on a warrant's issuance can be measured only by what is in that affidavit"). The information submitted was that Berg had seen child pornography with his own eyes. But if the Affidavit in this case did not provide a substantial basis for probable cause, it was not completely devoid of evidence suggesting the existence of child pornography in unit 234. See, id. at 596 (upholding search warrant under Leon exception even where insufficient facts were presented to establish probable cause to link residence to marijuana patches because the facts presented "were not so vague as to be conclusory or meaningless"). Accordingly, the officers in good faith could rely on the warrant to search unit 234.

In reaching the conclusion that probable cause for a search warrant could be gleaned from the four corners of the Affidavit or, at a minimum, the officers could in good faith rely on the search warrant that was issued, this Court is not unmindful of Defendant's contention that the Affidavit is faulty because Crabbe did not report his own viewing of the items in the unit to the state court judge. "But to be constitutionally problematic, the material must have been deliberately or recklessly omitted and must have undermined the showing of probable cause." Carpenter, 360 F.3d at 597 (italics in original). Here, Crabbe's entry into the unit did not exceed the scope of the private search and it did not undermine the showing of probable cause; rather, it bolstered the showing. Thus, his failure to disclose he stepped in the unit is not fatal

30

to the validity of the search warrant that was issued.  See, United States v. Trujillo, 376 F.3d 593, 603-04 (6th Cir. 2004)(no Franks violation where inclusion of fact which had been excluded from affidavit would not have negated finding of probable cause).

### 3. *Search of Defendant's Computer and Disks*

Defendant has also moved to suppress the fruits of the search of his computer and the disks found in his apartment.  He does so solely on the grounds that the search of those items was the result of investigative information which arose from the search of his storage unit.  However, this Court has concluded that the search of unit 234 was not unlawful and therefore his request to suppress the evidence seized as a result of the search of his computer and disks must be denied.

### III. CONCLUSION

On the basis of the foregoing, Defendant's "Motion to Dismiss Indictment" (Docket Entry No. 16) will be denied.  Defendant's "Motion to Suppress the Fruits of the Warrantless Search and Subsequent Judicially Authorized Search of  Richards' Storage Unit and for a Franks Hearing" (Docket Entry No. 18) will also be denied.

An appropriate Order will be entered.

ROBERT L. ECHOLS
UNITED STATES DISTRICT JUDGE

31